**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANNE M. MURPHY, | No. CIV S-04-2389-CMK |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| JO ANNE B. BARNHART, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 14) and defendant's cross-motion for summary judgment (Doc. 20).

/ / /

/ / /

/ / /

/ / /

# I. BACKGROUND

Plaintiff applied for disability insurance ("DI") benefits on January 24, 2000, based on disability. In her applications, plaintiff claims that her impairment began on August 16, 1993. Plaintiff claims her disability consists of a combination of "neck fusion C5-6 with excessive movement, headaches, nausea, pain, back pain, and knee problem." Plaintiff is a United States citizen born December 31, 1947, with a high school education completed in 1965. Plaintiff also has some special job training and/or vocational school.

Plaintiff's claims were initially denied. Following denial of her request for reconsideration, plaintiff requested an administrative hearing, which was held on March 19, 2002, before Administrative Law Judge ("ALJ") William L. Stewart, Jr. A supplemental hearing was held before the same ALJ on July 12, 2002.

In his August 29, 2002, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits at least through December 31, 1994;

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability;

3. The claimant has an impairment or a combination of impairments considered severe based on the requirements in the Regulations; she has a history of injury, degenerative disc disease, headaches, torn meniscus, status post surgery, a history of right shoulder impingement syndrome, status post surgery, and a history of vertigo; she has a variety of diagnoses which are not firmly established and are regarded as being non-severe;

4. These medically determined impairments, severe and non-severe, singularly and in combination, do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4;

5. The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision;

6. Consideration has been given to all of the medical opinions in the record regarding the severity of the claimant's impairments;

///

7. For the period as of and prior to the date when the claimant last met the disability insured status requirements of the Act for periodic disability insurance benefits, on December 31, 1994, the record has established that the claimant was limited from lifting and carrying more than 10 pounds, that she had difficulty reaching overhead, and that she required an opportunity to change position; she was unable to crouch or crawl; she was limited to occasional stair climbing, balancing, stooping, and kneeling; she had difficulty walking on rough ground;

8. By the time of her application for benefits on January 24, 2000, the claimant's condition had worsened and she was further limited by an inability to sustain regular activity; the claimant did not retain the residual functional capacity to complete a normal workday and workweek without interruption from physically based symptoms; the claimant could not perform at a consistent pace without an unreasonable number and length of rest periods or absences, even if working in a sedentary capacity;

9. The claimant is unable to perform any of her past relevant work;

10. The claimant is a younger individual;

11. The claimant has more than a high school education;

12. The claimant has transferable skills from skilled work previously performed as described in the body of the decision;

13. The claimant has the residual functional capacity to perform a reduced range of sedentary work;

14. Prior to December 31, 1994, although the claimant's exertional limitations did not allow her to perform the full range of sedentary or light work, there were jobs in significant numbers in the national economy that she could perform; examples of such jobs include work as an information and reception clerk and interview clerk;

15. The claimant was not under a disability, as defined in the Social Security Act, prior to December 31, 1994, her date last insured for Title II disability benefits; and

16. The claimant has been under a disability, as defined in the Social Security Act, since January 24, 2000.

Based on these findings, the ALJ concluded that plaintiff was not disabled prior to December 31, 1994, and, therefore, not entitled to DI benefits.

///

///

///

Plaintiff sought review by the Appeals Counsel, arguing:

1. The ALJ improperly rejected the opinions and ultimate conclusions of plaintiff's treating and examining physicians concerning plaintiff's disability, without stating clear and convincing reasons nor specific and legitimate reasons supported by substantial evidence in the record for doing so;

2. The ALJ did not properly evaluate the combined effect of plaintiff's medically verified impairments and consider whether, taken together, they resulted in limitations equal in severity to those specified by the Listings or resulted in limitations of disabling severity;

3. The ALJ erred by relying on the opinion of a non-examining physician (Dr. Cohen[1] at the hearing), since the opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician;

4. The ALJ rejected plaintiff's pain testimony without making specific findings stating clear and convincing reasons for doing so; and

5. The ALJ erred by basing his decision on the opinion of the vocational expert, based on an incomplete hypothetical which failed to accurately reflect the plaintiff's condition, and by disregarding the vocational expert's answer when questioned concerning plaintiff's actual condition as evidenced by the record.

After the Appeals Council declined review on August 27, 2004, this appeal followed.

## II. STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole,

---

[1] The ALJ referred to the testifying non-examining consultative physician as "Dr. Cohn." However, the hearing transcript and the parties' briefs adopt the spelling "Cohen," which the court will also adopt.

including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

### III.  DISCUSSION

In her motion for summary judgment, plaintiff raises four of the same arguments she made to the Appeals Council.  Specifically, plaintiff argues:

1. The ALJ improperly rejected the opinions and ultimate conclusions of plaintiff's treating and examining physicians concerning plaintiff's disability, without stating clear and convincing reasons nor specific and legitimate reasons supported by substantial evidence in the record for doing so;

2. The ALJ erred by relying on the opinion of a non-examining physician (Dr. Cohen at the hearing), since the opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician;

3. The ALJ rejected plaintiff's pain testimony without making specific findings stating clear and convincing reasons for doing so; and rejected the lay testimony of plaintiff's husband without stating reasons germane to

        the witness[2]; and

4.  The ALJ erred by basing his decision on the opinion of the vocational expert, based on an incomplete hypothetical which failed to accurately reflect the plaintiff's condition, and by disregarding the vocational expert's answer when questioned concerning plaintiff's actual condition as evidenced by the record.

It appears that plaintiff has abandoned her argument to the Appeals Council that the ALJ did not properly evaluate the combined effect of her medically verified impairments.

  **A.**  <u>**Weight Given to Medical Opinions**</u>

    Plaintiff argues that the ALJ improperly gave greater weight to the opinion of a non-examining consultative physician than the opinion of her treating physician. Specifically, plaintiff asserts that the ALJ erred by giving great evidentiary weight to the opinion of Dr. Cohen, while rejecting the opinion of Dr. Dorsett.

    Before analyzing the ALJ's findings as to Dr. Dorsett and Dr. Cohen, the court will address plaintiff's argument that the ALJ was required by the regulations to "recontact" Dr. Dorsett and that his failure to do so constitutes error. Plaintiff cites 20 C.F.R. § 404.1512(e)(1) in support of her argument. As defendant correctly observes, this regulation requires an ALJ to "recontact" only when a treating physician's report contains a conflict or ambiguity, does not contain all of the necessary information, or does not appear to be based on acceptable techniques. <u>See id.</u> The court has reviewed Dr. Dorsett's report and finds none of the flaws outlined in the regulation. This is not a case of an internal ambiguity within a single doctor's report. Rather, it is a case of conflicting opinions from different doctors. As such, the ALJ was not required to "recontact" Dr. Dorsett.

    As to the salient medical opinions, the ALJ stated:

> John Dorsett, M.D., has been treating the claimant since at least May 6, 1993. On March 25, 2002, Dr. Dorsett noted that the claimant has a history of chronic neck pain, back pain, left knee pain, and the presence of

---

[2] This part of the argument was not raised in plaintiff's brief to the Appeals Council.

6

a lumbar pars defect. He noted that the claimant had an anterior cervical fusion and discectomy at C5-6 on August 16, 1993, and has a persisting disc bulge on the right of the C6-7 region. He also notes that the claimant has had arthroscopic surgery on her left knee and underlying migraine headaches. He notes they are relatively unpredictable and may occur a couple of times a year. He concluded in his March 25, 2002, letter that the claimant is unable to tolerate even a four-hour work day secondary to her complaints. He notes that the claimant has reported neck pain, back pain, left knee pain, right shoulder pain, and headaches since December of 1994. He notes the claimant is on chronic opioid medications to allow her to function with her daily activities.

At the hearing, Dr. Cohen testified as a medical expert. Dr. Cohen reviewed the medical evidence generated at the time in 1994, 1996, and 1997, and forward. It was his testimony that the record shows a worsening condition which is appropriately characterized for the period prior to January 24, 2000, by limitations from lifting and carrying more than 10 pounds frequently, with difficulty reaching overhead, a need for an opportunity to change position, and a limitation to occasional stair climbing, balancing, stooping, and kneeling. She was unable to crouch or crawl. She had difficulty walking and that by the time of her application for benefits on January 24, 2000, she was further limited by an inability to sustain regular activity. It was noted that the claimant participated in a walking program in 1994 and 1995. Records from 1996 showed progressive change and gradual worsening. She began methadone treatment in early 1998. Records show that her neck pain was worse in March 1997. Dr. Cohen also recognized that, while the claimant reported vascular migraine headaches, in October 1994 noted fairly infrequent migraine headaches which were difficult to control and more frequent but easier to control muscular contraction headaches. It was his impression that the claimant's headaches would not preclude her from working during the earlier period of time. Dr. Cohen reviewed Dr. Dorsett's comments. . . to the effect that the claimant could not have tolerated regular work in December 1994. It was his statement that he did not agree with that conclusion, although he acknowledged that Dr. Dorsett was a treating physician and was advantaged by his observations over time.

While there followed a lengthy exchange about whether Dr. Dorsett's comments were addressed to the claimant's past work or to any work, this is not viewed as being critical. Dr. Cohen is understood to have commented that the records generated at the time of the claimant's treatment in 1994 did not show limitations which would preclude her from performing work within the capacity for sedentary exertion which was reviewed with Dr. Cohen and is included in this decision as the assessment of residual functional capacity for that period of time. He acknowledged that the claimant was unable to perform the work she performed before, even in 1994. He stated that he disagreed with Dr. Dorsett's conclusion, and his reason for doing so was his review of what the actual records of treatment in 1994 showed. It certainly appears that the record supports Dr. Cohen's conclusion and does not support Dr. Dorsett's statement. The claimant's condition definitely worsened until,

7

by the time of her application on January 24, 2000, she was unable to sustain regular activity. This was due to her worsening condition and accelerating symptoms. While the record supports limitations similar to those outlined in Dr. Dorsett's letter, for the current period of time, the record does not support application of those limitations to the claimant's capacity in 1994.

The central question in this case is whether there is substantial evidence in the record to support a finding that plaintiff was not under a disability prior to December 31, 1994. According to the ALJ, Dr. Dorsett noted the following for the relevant period: (1) anterior cervical fusion and discectomy at C5-6 on August 16, 1993; (2) plaintiff reported neck pain, back pain, left knee pain, right shoulder pain, and headaches since December 1994; and (3) plaintiff could not have tolerated regular work in December 1994. According to the ALJ, Dr. Cohen noted the following: (1) plaintiff participated in a walking program in 1994 [and 1995]; (2) by October 1994 plaintiff suffered infrequent migraine headaches, which were difficult to control, and more frequent but easier to control muscular contraction headaches; and (3) medical records from 1994 show that plaintiff could have performed sedentary work at the time. Given this understanding of the medical evidence and opinions, the ALJ was faced with a conflict. On the one hand, Dr. Dorsett opined that, by December 1994, plaintiff could not have tolerated any kind of regular work. On the other hand, Dr. Cohen opined that plaintiff could perform sedentary work.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record. See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

This case presents the troubling combination of a treating physician who mainly saw plaintiff after December 31, 1994, as her condition clearly worsened, and a non-examining consultative physician who testified based on a one-time record review. Dr. Dorsett's opinion is entitled to some deference because he was plaintiff's treating physician. In fact, Dr. Cohen acknowledged as much in his testimony. However, Dr. Dorsett's opinion as to the period of time prior to December 31, 1994, is based on limited opportunity for observation given that he began

treating plaintiff just the prior year.[3]  As to Dr. Cohen's opinion, while the court accepts that it was based on a thorough review of all of plaintiff's medical records, he is admittedly only a non-examining consultative physician.

If there are insufficient clinical or laboratory findings to support Dr. Dorsett's conclusion as to plaintiff's ability through December 31, 1994, then the ALJ was proper in rejecting his testimony as inconsistent with the evidence of record.  See id.  The records of Dr. Dorsett's treatment notes through December 31, 1994, can be summarized as follows:

October 25, 1993, Notes

Dr. Dorsett noted that plaintiff was referred to him for evaluation post-surgery. At the examination, plaintiff reported that the neck pain was a "2 out of 10" in severity.  Dr. Dorsett assessed plaintiff as follows: "The patient is doing well and has evidence of myofascial pain and trigger points in her trapezius and cervical paraspinous muscles.  This is not uncommon following this type of injury.  The patient still has some weakness in the C6 distribution bilaterally, worse on the left than the right, and numbness also."

November 22, 1993, Notes

Plaintiff reported continuing severe "suboccipital pain," but that therapy had made a difference in her shoulder pain.  Plaintiff reported an episode of vertigo and was treated with medication which seemed to help.  On physical examination, Dr. Dorsett noted decreased pinprick sensation in the C6 distribution on the left.

January 7, 1994, Notes

Plaintiff's physical therapy was discontinued due to dizziness and vertigo. Plaintiff described light-headedness, trouble with balance, and vision problems. Findings on physical examination were unchanged.  Dr. Dorsett opined that even light work was contraindicated given plaintiff's vertigo.

March 14, 1994, Notes

Dr. Dorsett reported that an MRI had been performed and the results were normal. Dr. Dorsett stated that plaintiff may have Meniere's disease.  On physical examination, Dr. Dorsett observed: (1) severe neck tenderness; (2) mild to moderate tenderness to palpation along the cervical paraspinous muscles; and (3) tenderness over the bilateral joints; (4) tenderness over the distal vastus lateralis.

---

[3] While the ALJ stated in his decision that plaintiff had been treating with Dr. Dorsett since as early as May 1993, Dr. Dorsett's examination notes indicate that October 25, 1993, was plaintiff's initial visit.

April 21, 1994, Notes

Plaintiff was positively diagnosed with vertigo by the Palo Alto Meniere's Center. Plaintiff reported that her neck pain was unchanged. Dr. Dorsett noted that her physical examination results were unchanged from the last visit.

May 19, 1994, Notes

Plaintiff stated that she feels about the same. On physical examination, Dr. Dorsett noted tenderness over the right SI joint and minimal tenderness over the left.

June 23, 1994, Notes

Plaintiff underwent thyroid surgery on June 1, 1994, to remove a benign tumor. Plaintiff reported increased neck pain following this surgery. Plaintiff also complained of hot flashes and swelling in her ankles. Physical examination results were essentially unchanged.

August 15, 1994, Notes

Plaintiff stated her neck pain is about the same. She also reported that therapy had improved her right shoulder and left knee pain. Plaintiff also stated that the vertigo was steadily improving.

October 3, 1994, Notes

Plaintiff reported that her back pain is about the same, but that her headaches are very bad and awaken her at night.

October 26, 1994, Notes

Dr. Dorsett stated that plaintiff's vascular-type headaches had improved dramatically and plaintiff stated they are 50% better. Plaintiff reported that she only had "little" headaches for the prior three weeks. Plaintiff reported that her back pain was better. On physical examination, Dr. Dorsett noted: "There remain multiple tender points and trigger points in bilateral trapezius and rhomboids. The left hand appears much less swollen. Gait is steady, with no antalgia noted. Otherwise, her exam is unchanged. Dr. Dorsett stated that plaintiff continues to gradually improve.

December 28, 1994, Notes

Dr. Dorsett noted that plaintiff complained of worsening headaches since her last visit on October 26, 1994. Medication appeared not to be helping. Plaintiff reported that she received an injection of Toradol on December 8, 2004, which relieved her symptoms for about two days. Plaintiff stated that she had not felt so good for over two years. On physical examination, Dr. Dorsett noted: There is tenderness to palpation in the posterior spinous processes in the C4,5 and 6 region, as well as pain in the trapezius region bilaterally. There is intact pinprick sensation in bilateral upper extremities, with no significant dermatomal decrease.

11

The court rejects defendant's suggestion (at page 11, footnote 2, of her brief) that Dr. Dorsett's opinion was unreliable because it was based on plaintiff's subjective complaints of disabling pain. While it is certainly true that Dr. Dorset paid close attention to plaintiff's subjective complaints, it is clear based on the above summary of Dr. Dorsett's notes that he conducted a physical examination each time he saw plaintiff and that his impressions are based, at least in part, on his clinical findings.

In this case, Dr. Dorsett opined that plaintiff could not perform any kind of regular work because of her pain and other problems. The court finds that there are sufficient medical findings to support this assessment. Specifically, Dr. Dorsett's notes do not show any clear pattern of improvement by December 31, 1994. In fact, by that time, plaintiff had been diagnosed with vertigo and underwent thyroid surgery. Additionally, Dr. Dorsett consistently noted either unchanged or worsening conditions. Given the detailed treatment history preserved by Dr. Dorsett's notes through December 31, 1994, the court is left to wonder how the ALJ reached his conclusion.

The court concludes that the ALJ erred in rejecting Dr. Dorsett's opinion as to plaintiff's capabilities up to December 31, 1994, as inconsistent with the record. A remand is appropriate because it is possible that, upon reconsideration of Dr. Dorsett's opinion in the context of the treatment records summarized herein, the administrative result of this case may be different.

**B.    Reliance on Opinion of a Non-Examining Physician**

Plaintiff also argues that the ALJ erred in relying on Dr. Cohen's opinion because the opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. For the reasons discussed above, the court agrees.

**C.    Evaluation of Plaintiff's Pain**

Plaintiff asserts that the ALJ erred in his evaluation of plaintiff's pain in two the

following two ways: (1) The ALJ failed to state clear and convincing reasons for rejecting plaintiff's testimony; and (2) The ALJ failed to state reasons germane to the witness for rejecting the testimony of plaintiff's husband.

### 1. Plaintiff's Testimony

Plaintiff challenges the ALJ's finding that her testimony regarding pain was not credible. The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). An explicit credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony. See id. Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing." See id.

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; (5) physician and third-party testimony about the nature, severity, and effect of symptoms. See Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

As to plaintiff's pain testimony, the ALJ stated:

> The claimant's allegations of totally disabling impairments since 1993 cannot be totally accepted as credible. Nor can her July 12, 2002, hearing testimony indicating that uncontrolled migraine headaches have been incapacitating since 1994. As noted above, her treating physician indicated that migraine headaches occur only a couple of times per year. The claimant's allegations are disproportionate to the medical record. When the testifying medical expert asked the claimant if she could have performed office work in 1993 following her good surgical results, the claimant indicated that she could not work on the basis of her headaches. However, as noted by Malcolm Wilson, M.D., on October 17, 1994, he also noted the claimant to have fairly infrequent migraine-type headaches, as well as a more frequent and easier to control probably muscle-contraction headaches, for which the claimant was using [medication] as a prophylactic. . . When medical evaluator Denver Nelson, M.D., a neurosurgeon specialist, examined the claimant and reviewed her medical history for workers compensation, he concluded on January 4, 1995, that the claimant's work restrictions could include no repetitive bending, no prolonged standing or sitting, no lifting over 50 pounds, and no frequent lifting of the arms over the head. He concluded that the claimant could not return to her usual job. Based on his review of the record, testifying physician Cohen opined that the claimant was capable of sedentary work in 1994 and 1995. He noted that the condition subsequently worsened but this was after 1994, the claimant's date last insured for Title II disability benefits. The medical record indicates progressive and gradual worsening of the claimant's condition. The claimant has not been consistent in her reporting. For example, she initially noted in March of 1994 that the onset of her vertigo occurred six weeks after her neck surgery. However, by March of 1995, in retrospect, she reported that she developed vertigo about one week after her surgery. Based on all these factors, the claimant's representation of total disability in 1993 or 1994 is not fully credible.

The court is required to give deference to these findings as long as they are based on the proper process and reasons. See Saelee, 94 F.3d at 522. Here, the ALJ clearly used the proper process by identifying the non-credible testimony and the evidence tending to undermine it. See Lester, 81 F.3d at 834. The court also finds that the various reasons given by the ALJ were legally proper. See Smolen, 80 F.3d at 1284; see also Bunnell, 947 F.2d at 345-47.

        2.        <u>Testimony of Plaintiff's Husband</u>

Plaintiff's husband testified at the administrative hearing as follows:

Q:        Mr. Murphy, have you been connected with Anne Murphy since her injury in 1993?

A:        Yes, sir. I've known her for thirty years.

| | | |
|---|---|---|
| 1 | Q: | Have you seen – you've had an opportunity, obviously, to see her pretty much on a daily basis? |
| 2 | A: | Yes, sir. |
| 3 | Q: | Can you tell us whether or not she's had headaches – migraine headaches since her hospitalization for the neck surgery and then after? |
| 4 | | |
| 5 | A: | Yes, sir. |
| 6 | Q: | Could you describe what you see and – when she has one? |
| 7 | A: | She's in obvious pain.  She has to go lay down. |
| 8 | Q: | And has she – has your life – has it changed because of these headaches? |
| 9 | A: | Yes, it has. |
| 10 | Q: | How often do you see her having one of these? |
| 11 | A: | Several times a week on an average. |
| 12 | Q: | And when she has one, would you describe what she does and what you do and – |
| 13 | | |
| 14 | A: | Regardless – |
| 15 | Q: | – what happens, what happens in your family when a headache happens? |
| 16 | A: | Well, regardless, of who's present – my son's there from out of town, and when they arrive, family gatherings and what not, when it comes on, she just excuses herself and off to the bedroom and she's gone. |
| 17 | | |
| 18 | Q: | Has that frequency remained relatively stable throughout the – since 1993 to present? |
| 19 | A: | Yes, sir. |
| 20 | Q: | Have you had plans interrupted because you've tried to plan for something and then a headache came on and you couldn't do it? |
| 21 | | |
| 22 | A: | On one occasion, but usually she just – you know, she'll go along anyway. |
| 23 | Q: | Have you ever had – noticed anything to do with this positional vertigo that she had early on.  I know she had some dizziness after her surgery. |
| 24 | A: | She couldn't drive for eight months.  That was quite stressful on her. |
| 25 | Q: | Do you have to help her with activities of daily living? |
| 26 | A: | I do the housework more than I did in the past. |

15

| | | |
|---|---|---|
| 1 | Q: | Does, does she ever require any assistance with dressing or bathing or anything like that? |
| 2 | | |
| 3 | A: | Not to often. I have, I have helped her pull her slacks on. She has a, has a bad back and has had shoulder surgery also, but normally she does it herself. |
| 4 | | |
| 5 | Q: | Okay. Since this injury – what – records in the file at some point, to her being stoic and I asked her whether she was kind of a macho lady. What, what, what is her presentation? |
| 6 | | |
| 7 | A: | She's not a whiner. She doesn't complain. She just – she suffers through it. Suffers in silence. |
| 8 | Q: | Do you have to kind of beat out of her what's going on sometimes? |
| 9 | A: | Yes. |
| 10 | Q: | Does that bother you a little bit? |
| 11 | A: | No, it's, it's been so long. I'm, I'm acclimated to it. I don't know how she does it. They, they sent her to a psychologist the county pays for and that's a monthly visit, visit to deal with this pain, how, how to manage it. |
| 12 | | |
| 13 | Q: | Does she ever cry – |
| 14 | A: | Yes, sir. |
| 15 | Q: | – due to pain? Are they real tears? |
| 16 | A: | Yes, sir. |
| 17 | Q: | And has that been the case throughout the years? |
| 18 | A: | Yes, sir. |

"[L]ay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996); see also Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th Cir. 1993) (friends and family members in a position to observe a plaintiff's symptoms and daily activities are competent to testify to condition). "If the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness." Dodrill, 12 F.3d at 919. Plaintiff argues the ALJ failed to do so.

16

As to this testimony, the ALJ stated:

> The claimant's husband testified that the claimant has had headaches and vertigo and he "helps" her with housework and dressing. He notes that the pain causes her to cry although she often suffers in silence. This reporting is not inconsistent with the findings arrived at herein.

The court fails to see how the ALJ rejected plaintiff's husband's testimony, either explicitly or implicitly, as plaintiff suggests in her brief. The ALJ clearly stated that the testimony was "not inconsistent" with the evidence. While this is certainly not a ringing endorsement of plaintiff's husband's testimony, it is not a rejection. Because the ALJ did not reject the testimony, plaintiff's argument cannot serve as a basis for a finding of error.

### D.  Hypothetical Questions

Finally, plaintiff asserts that the ALJ erred by failing to base his hypothetical questions posed to the vocational expert on the limitations opined by his treating physician, Dr. Dorsett. Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant. See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989). If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value. See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991). While the ALJ may pose to the expert a range of hypothetical questions, based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole. See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

Logically, this argument is directly linked with plaintiff's arguments concerning the ALJ's reliance on the various medical opinions. If the ALJ improperly rejected Dr. Dorsett's opinion, plaintiff's argument concerning hypothetical questions succeeds. As discussed above, the court finds that the ALJ erred in rejecting Dr. Dorsett's opinion.

///

## IV.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment is granted;
2. The Commissioner's cross motion for summary judgment is denied;
3. This matter is remanded for further proceedings consistent with this order; and
4. The Clerk of the Court is directed to enter judgment and close this file.

DATED:  March 14, 2006.

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE